UNITED STATES

v.

Master Sergeant Steve E. DOANE,
United States Air Force.

ACM 33234.

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 16 March 1998.

Decided 2 April 2001.

Burd, J., filed concurring opinion.

Spisak, Senior Judge, filed opinion concurring in part and dissenting in part in which Pecinovsky, J., concurred.

Breslin, J., filed opinion dissenting in part, but concurring in result, in which Roberts, J., concurred.

Starr, Senior Judge, filed opinion dissenting, but concurring in result.

Health Services at Elmendorf Air Force Base (AFB), Alaska.

Appellate Counsel for Appellant: Colonel Douglas H. Kohrt and Captain Patience E. Schermer.

Appellate Counsel for the United States: Colonel Anthony P. Dattilo, Lieutenant Colonel Ronald A. Rodgers, and Major Steven B. Thompson.

EN BANC YOUNG, Chief Judge, SPISAK, SCHLEGEL, STARR, Senior Judges, BURD, HEAD, ROBERTS, PECINOVSKY, and BRESLIN, Appellate Military Judges.

## OPINION

YOUNG, Chief Judge:

May a military accused lawfully be ordered into pretrial confinement while awaiting trial *solely* to prevent him from committing suicide? We hold that he may not.

The appellant pled guilty to, and was convicted of, committing indecent acts on his daughter, who was under 16 years of age. Article 134, UCMJ, 10 U.S.C. § 934. The approved sentence consists of confinement for 12 months and reduction to E–4. The appellant claims the military judge erred by denying his motion for appropriate relief for illegal pretrial confinement, the sole purpose of which was to prevent him from committing suicide. We find error, but affirm the findings and sentence.

## I. Facts

On 17 September 1997, Air Force authorities learned that the appellant had been committing indecent acts on his daughter. The acts occurred over a four-year period while the daughter was between 12 and 15 years of age. On 19 September, the appellant voluntarily admitted himself to a civilian mental health facility because of suicidal ideation. He was released on 30 September because he was no longer "actively suicidal," but continued to receive treatment from Major (Doctor) Bradshaw, the Chief, Outpatient Mental

During December, the appellant was permitted to go on emergency leave to New York. He returned as scheduled. He voluntarily admitted himself to a mental health facility again because of suicidal ideation, but was later released. During the first week of January 1998, the appellant was sent to David Grant Medical Center at Travis AFB, California, for psychiatric evaluation. As the appellant was not imminently suicidal, he was returned to duty at Elmendorf AFB. On 10 February 1998, the appellant was informed that a specification had been preferred against him under Article 134, UCMJ, alleging he committed indecent acts with his daughter.

On 2 March, during a routine appointment, the appellant told Dr. Bradshaw that he had lied the previous Friday when he said he was not considering suicide. He admitted that he had in fact considered two plans. He described one of the plans to Dr. Bradshaw. The appellant told Dr. Bradshaw that he felt better as the weekend progressed and he became determined to make it to the next day. The appellant explained to Dr. Bradshaw that he was not then suicidal. Dr. Bradshaw telephoned the appellant's first sergeant expressing his concern that the appellant might commit suicide.

The first sergeant took Dr. Bradshaw's call after he had just finished speaking with Mr. Wallrich, one of the appellant's coworkers. Mr. Wallrich reported to the first sergeant that the appellant had claimed to have had a difficult weekend—the appellant had planned to commit suicide and was surprised that he had not done so. Mr. Wallrich also described for the first sergeant at least one of the appellant's plans—the appellant intended to take his medication and drive off. Apparently, the first sergeant understood Mr. Wallrich to say that the appellant would flee from prosecution.

Based on his discussions with Dr. Bradshaw and Mr. Wallrich, the first sergeant recommended to Lieutenant Colonel (Lt Col) Jackson, the commander, that she order the appellant into pretrial confinement. Lt Col

Jackson ordered the appellant into pretrial confinement on that date.

On 4 March 1998, in a memorandum to the wing commander, Lt Col Jackson reviewed the probable cause to order the appellant into pretrial confinement. *See* Rule for Courts–Martial (R.C.M.) 305(h)(2) and (i)(1). She claimed that pretrial confinement was necessary "because it is foreseeable that MSgt Doane will commit suicide or make a suicidal gesture, or he will flee, and thus not appear at trial." She concluded that pretrial confinement was still appropriate because the appellant "continues to express thoughts of suicide and flight." Lt Col Jackson attached a memorandum from Dr. Bradshaw to her memorandum for the wing commander.

In his memorandum, Dr. Bradshaw noted that "there exist[s] a high probability [the appellant] will either make an attempt or gesture at suicide in order to avoid the impending trial," but the appellant did not meet the criteria for psychiatric hospitalization against his will. Dr. Bradshaw had seen the appellant once or twice a week from October to December 1997 and then twice weekly after the appellant was discharged from the civilian mental health facility in December. In the memorandum, he described his meeting with the appellant on 2 March.

On 6 March, a pretrial confinement hearing was held pursuant to R.C.M. 305(i)(2) and Air Force Instruction 51–201, *Administration of Military Justice,* Chapter 3 (3 Oct 1997). Dr. Bradshaw testified before the Pretrial Confinement Reviewing Officer (PCRO) that he did not believe the appellant intended to flee. He thought the appellant's comments about driving away were directly related to his suicidal ideation and more likely related to him driving off into freezing water to kill himself—one of the methods of killing himself the appellant had described during one of his previous hospitalizations. Dr. Bradshaw noted that under Alaska law, a person could be involuntarily committed if he were an imminent risk to himself. However, in order to satisfy that test, he would have to be able to state that the appellant had a "given plan and that he's going to go and act on it at that point." He admitted that the appellant did not meet that criteria when he

was placed in pretrial confinement. But, he further testified, as follows:

> I think either in a gesture or an attempted suicide the accused would be unavailable for trial. I think there's a high risk. I don't believe there's any lesser form of restraint to ensure that he's not going to make this suicidal gesture. My lesser form of restraint is outpatient management. Unfortunately, someone can't be with him 24 hours a day. Occasionally we use family to make a commitment about watching a suicidal patient, but even that becomes difficult. It's especially difficult, if they have no real connection, like his roommate, because they become responsible for someone's life. So, that's not a call we're comfortable making usually.
>
> . . .
>
> I believe pretrial confinement would provide the accused protection from acting out. The risk factors that were there on Monday have not changed at all.
>
> The stressors that the accused is under are the same as the ones on 27 February. In my opinion, I believe he's at a high risk for either a suicide gesture or attempt before the trial on 16 March.

Dr. Bradshaw testified that his preferred "route" for the appellant was hospitalization, however, the appellant did not meet the criteria for involuntary commitment and refused to voluntarily hospitalize himself.

Mr. Wallrich testified that, on 2 March, the appellant told him that it was a miracle that he was here anymore as he had planned on committing suicide during the previous weekend.

The PCRO recommended the appellant's continued pretrial confinement. He wrote,

> It was the clear testimony of Dr. Bradshaw that, if not confined, there is a high risk that MSgt Doane will not present himself for trial. Others testified that they believed MSgt Doane would appear. The weight given to their testimony has to be less than that given to Doctor Bradshaw, a mental health expert who has worked with MSgt Doane over the last several months. Much was made by MSgt Doane's counsel that it is inappropriate to use confinement

to prevent suicide. This preventative aspect is a serendipitous outcome of using confinement to assure his appearance at trial, not the reason for the confinement. Confinement is appropriate.

At trial, the appellant made a motion for three-for-one administrative credit for illegal pretrial confinement. R.C.M. 305(k). The basis of the motion was that the evidence did not support the PCRO's findings; the evidence did not support a finding that pretrial confinement was appropriate under the UCMJ; the conditions of confinement were more severe than they needed to be; and the wing commander and the legal office discussed the likelihood that three-for-one credit would be given if the confinement was found to be illegal.

The military judge found that the PCRO did not abuse his discretion when he recommended the appellant's continuation in pretrial confinement. He reviewed the "factual basis" considered by the PCRO and found it "adequate to support [the PCRO's] conclusions."

## II. Law

■ Any military person charged with an offense under the UCMJ "shall be ordered into arrest or confinement, as circumstances may require." Article 10, UCMJ, 10 U.S.C. § 810. Any commissioned officer may order an enlisted person into pretrial confinement. R.C.M. 304(b)(2). To do so, the officer must have reasonable grounds to believe the appellant committed an offense triable by court-martial and that pretrial confinement is required by the circumstances. R.C.M. 304(c). Whether pretrial confinement is required by the circumstances involves two separate determinations: (1) whether there is an adequate basis for ordering the confinement; and (2) whether there is a need for the confinement as opposed to some lesser form of restraint. *United States v. Heard,* 3 M.J. 14, 20–21 (C.M.A.1977). Our superior court has recognized an adequate basis exists for pretrial confinement "to assure the presence of an accused at his trial" and to avoid "foreseeable future serious criminal misconduct of the accused, including

any efforts at obstructing justice." *Id.* at 20. *See* R.C.M. 305(h)(2)(B).

Based on *Heard,* and other decisions of our superior court, the President determined that pretrial confinement is necessary when it is foreseeable that the servicemember would not appear at trial, pretrial hearing, or investigation, or the prisoner would engage in serious criminal misconduct. R.C.M. 305(h)(2)(B)(iii). *See Manual for Courts-Martial, United States (MCM),* A21–16 (1995 ed.). The accused's character and mental condition are among factors to be considered in determining the issue. R.C.M. 305(h)(2)(B) Discussion.

■ We review questions related to the legality of pretrial confinement for an abuse of discretion based on the facts that were before the deciding official. *United States v. Gaither,* 45 M.J. 349, 351–52 (1996).

## III. Discussion

An accused is presumed innocent until his guilt is established by legal and competent evidence beyond a reasonable doubt. *Heard,* 3 M.J. at 20. *See* Article 51, UCMJ, 10 U.S.C. § 851. The presumption of innocence is a fundamental component of due process, and the liberty of an accused prior to trial is inherent in that presumption. *Courtney v. Williams,* 1 M.J. 267, 271 (C.M.A.1976) (citing *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). "If a person may arbitrarily be confined before his trial, then in truth punishment precedes conviction and the presumption of innocence avails defendant little." *Id.* (quoting *DeChamplain v. Lovelace,* 510 F.2d 419, 424 (8th Cir.), *judgment vacated as moot,* 421 U.S. 996, 95 S.Ct. 2392, 44 L.Ed.2d 664 (1975)). Furthermore, pretrial confinement imposes physical and psychological deprivations on an accused and hampers his ability to prepare his defense. *Id.* Therefore, unless pretrial confinement "is compelled by a legitimate and pressing social need sufficient to overwhelm the individual's right to freedom ... restrictions unnecessary to meet that need are in the nature of intolerable, unlawful punishment." *Heard,* 3 M.J. at 20.

In the National Defense Authorization Act for Fiscal Year 1993, Pub.L. 102–484 § 546, 106 Stat. 2315 (1992), Congress and the President required the Secretary of Defense to revise applicable regulations concerning mental health evaluations of military members. Inpatient mental health evaluations were to be used "only if and when such an evaluation cannot appropriately or reasonably be conducted on an outpatient basis, in accordance with the least restrictive alternative principle." *Id.* at § 546(b)(2)(A). If compliance with any of the procedures of the statute is impractical, "the commanding officer seeking the referral shall prepare a memorandum setting forth the reasons for the inability to comply with such procedures." *Id.* at § 546(c)(5).

> The term "least restrictive alternative principle" means a principle under which a member of the Armed Forces committed for hospitalization and treatment shall be placed in the most appropriate and therapeutic available setting (A) that is no more restrictive than is conducive to the most effective form of treatment, and (B) in which treatment is available and the risks of physical injury or property damage posed by such placement are warranted by the proposed plan of treatment.

*Id.* at § 546(g)(5).

The Department of Defense implemented the statute. *See* Department of Defense Directive (DoDD) 6490.1, *Mental Health Evaluations of Members of the Armed Forces* (1 Oct 1997); Department of Defense Instruction 6490.4, *Requirements for Mental Health Evaluations of Members of the Armed Forces* (28 Aug 1997). These directives balance the needs of the commander to protect the welfare of her troops against the interests of the individual in maintaining his freedom. We found no mention of these directives or the statute in the record.

DoDD 6490.1 provides that a servicemember shall be admitted to a psychiatric unit for inpatient evaluation or treatment only if such evaluation or treatment is clinically indicated. The final decision to admit the member "rests solely with a mental healthcare provider granted hospital admitting privileges." DoDD 6490.1, ¶ 4.2.5. A servicemember shall not be involuntarily admitted unless a healthcare provider,

> privileged to admit psychiatric patients, makes a reasoned, good faith clinical judgment that the Service member has, or likely has, a severe mental disorder and poses a danger to himself, herself and/or others, such that the evaluation or treatment cannot reasonably be provided by a less restrictive level of care or when less intensive treatments would result in inadequate medical care. Hospitalization is appropriate only when consistent with the least restrictive alternative principle under the American Psychiatric Association's guidelines....

*Id.* at ¶ 4.5.2.

The appellant claims he was ordered into pretrial confinement solely to prevent him from committing suicide, and therefore, his pretrial confinement was unlawful. The appellee does not specifically disagree with the first part of that claim. Instead, the United States argues that an accused's mental condition is a factor to consider in determining whether to order pretrial confinement, an accused who commits suicide will not be present for trial and, therefore, the appellant's incarceration was lawful. Based on Dr. Bradshaw's testimony, the United States is confident that the commander and PCRO's findings are supported by a preponderance of the evidence.

■ Although, an accused's mental condition is an appropriate consideration in deciding whether to place or maintain an accused in pretrial confinement, it must be relevant to the two basic criteria for pretrial confinement: (1) whether the accused will be present for trial; and, (2) whether the accused is a threat to commit other acts of serious misconduct. The United States has not cited, nor have we been able to find, any cases, including those cited in Judge Breslin's dissent, in which a court, either military or civilian, has approved pretrial confinement based on the probability of the accused committing suicide. We believe there is good reason for the lack of such cases.

There is a fundamental difference between how we treat an accused who is a threat to himself and an accused who is either a threat

to flee the jurisdiction to avoid prosecution or to commit other serious offenses. The latter we put in pretrial confinement. The former we refer to mental health practitioners for evaluation and treatment and, if necessary, involuntary commitment in a mental health facility. We do not put an accused in pretrial confinement solely to protect against the risk that an accused might kill himself.

■ Although perhaps not as rigorous as confinement of a sentenced prisoner, an accused in pretrial confinement is no less a prisoner, subject to all the deprivations inherent in prison life. To suggest that the government can order an accused into pretrial confinement solely because of a mental condition that would not qualify him for involuntary hospitalization seems incongruous to us. The health and welfare of military personnel is a command responsibility. Ordering or continuing an accused in pretrial confinement solely because he is suicidal is not a proper command response. We hold that preventing an accused from committing suicide is not a valid basis for ordering that accused into pretrial confinement. *Cf. Berta v. United States,* 9 M.J. 390 (C.M.A.1980) (mem.) (holding pretrial confinement is not appropriate to protect an accused from injury by others); *New York ex rel. Bryce v. Infante,* 144 A.D.2d 898, 535 N.Y.S.2d 215, 216 (1988) ("a suicidal tendency cannot be equated with an intent to abscond or flee in the context of a bail application").

We reject the dissent's view that the intent to commit suicide amounts to serious misconduct warranting pretrial confinement. Judge Breslin is correct in asserting that a member who intentionally injures himself commits a serious offense under the UCMJ. *MCM,* Part IV, ¶ 103a (as a violation of Article 134, 10 U.S.C. § 934); Article 115, UCMJ, 10 U.S.C. § 915(2) (for the purpose of avoiding work, duty, or service). But, the Department of Defense, reacting to legislation enacted by Congress and signed by the President, specifically established the manner in which persons with mental health problems would be treated. Military personnel will not be involuntarily hospitalized because of suicidal ideation unless they meet certain criteria—the military member "has, or likely

has, a severe mental disorder and poses a danger to himself," and such hospitalization is "consistent with the least restrictive alternative principle under the American Psychiatric Association's guidelines." DoDD 6490.1 at ¶ 4.5.2.

In evaluating the appellant, Dr. Bradshaw was clear—the appellant's condition did not meet Alaska's standards for involuntary hospitalization. We are unable to discern from the record of trial whether Alaska's standards complied with the criteria in DoDD 6490.1, or whether the appellant could have been involuntarily hospitalized under the DoD criteria. We believe such questions are unimportant in resolving this issue. The appellant was not involuntarily hospitalized; he was incarcerated in a confinement facility where he received absolutely no mental health treatment. Even if the record established that the appellant's condition was serious enough to warrant involuntary hospitalization, it does not establish the appropriateness of pretrial confinement. Pretrial confinement is not an appropriate substitute for such treatment.

Despite the fact that the appellant's incarceration was objectively inappropriate to a reasonable person knowing all of the facts, we review the legality of pretrial confinement for an abuse of discretion based on the facts that were before the deciding official. *Gaither,* 45 M.J. at 351–52. Lt Col Jackson's decision to order the appellant into pretrial confinement was apparently based on the pending charges and the first sergeant's summary of his discussions with Mr. Wallrich and Dr. Bradshaw. The first sergeant understood Mr. Wallrich to say that the appellant might flee to avoid prosecution—Mr. Wallrich said the appellant had considered just driving away and not returning. Dr. Bradshaw told him the appellant would likely attempt suicide. In good faith, the first sergeant relayed this information to the commander. Based on the evidence that was before her, Lt Col Jackson's finding, by a preponderance of the evidence, that the appellant would flee to avoid prosecution was not clearly erroneous. Therefore, she did not abuse her discretion in ordering him into pretrial confinement.

It appears from the matters adduced at the pretrial confinement hearing that Lt Col Jackson's finding that the appellant would flee was based on a misunderstanding between the first sergeant and Mr. Wallrich. Although not a model of clarity, Mr. Wallrich's testimony before the PCRO does not support a conclusion that the appellant would flee to avoid prosecution. Mr. Wallrich knew the appellant had been hospitalized in the past and gone through the suicide prevention program. Mr. Wallrich believed the appellant was happy about making it through the weekend because he had been contemplating suicide.

■ The PCRO placed considerable stock in Dr. Bradshaw's testimony. Dr. Bradshaw explained that the appellant's statements to Mr. Wallrich about taking medications and driving off somewhere related to a plan the appellant revealed during his second hospitalization to drive off into the cold, Alaskan water and freeze to death. Thus, Mr. Wallrich, Dr. Bradshaw, and a few others testified that the appellant represented no risk of flight to avoid prosecution. There was no evidence to suggest that the appellant might be a flight risk. The PCRO's conclusion that continued pretrial confinement was appropriate because there was "a high risk" the appellant would "not present himself for trial" could only be based on the possibility that the appellant would commit suicide. Under these circumstances, the PCRO's decision to continue the appellant in pretrial confinement was error. Suicide prevention is not an adequate basis for placing or maintaining an accused in pretrial confinement.

## IV. The Remedy

■ Having found that the PCRO erred, we must determine the relief to which the appellant is entitled. The appellant was confined on 2 March, the PCRO's report is dated 6 March, and the sentence was adjudged on 17 March 1998. At trial the parties determined that 16 days had been served in pretrial confinement. Our Army brethren have held that "any part of a day in pretrial confinement must be calculated as a full day for purposes of pretrial confinement credit ... except where a day of pretrial confinement is also the day the sentence is imposed." *United States v. DeLeon,* 53 M.J. 658, 660 (Army Ct.Crim.App.2000). We find *DeLeon* is the correct standard and adopt it for Air Force practice. Using that standard, the appellant should have been awarded credit for 15, not 16, days of pretrial confinement. The appellant is entitled to additional credit for the 11 days of pretrial confinement which were illegal—from the date of the PCRO's report until the date sentence was announced. Taking into consideration the conditions of the appellant's pretrial confinement, we order he be granted two days of additional credit for each day of illegal pretrial confinement—22 additional days.

■ The final issue is how to apply those 22 additional days of confinement credit against the appellant's sentence. Congress delegated authority to the President to make procedural rules (Article 36, UCMJ, 10 U.S.C. § 836), and set maximum punishments (Article 56, UCMJ, 10 U.S.C. § 856). The President decided that the credit should be applied against the confinement *adjudged.* R.C.M. 305(k).

In *United States v. Rock,* 52 M.J. 154 (1999), the United States Court of Appeals for the Armed Forces seemed to establish a different rule for applying confinement credit. *If the credit is administrative*—i.e., credit for time actually served in pretrial confinement (*United States v. Allen,* 17 M.J. 126 (C.M.A.1984)) or time under conditions on liberty tantamount to confinement (*United States v. Mason,* 19 M.J. 274 (C.M.A.1985))—an accused is entitled to day-for-day credit applied against the lesser of the adjudged sentence or the sentence stipulated to in the pretrial agreement. *If the credit is awarded by a military judge*—e.g., for illegal pretrial punishment (Article 13, UCMJ, 10 U.S.C. § 813), or for periods of illegal pretrial confinement (*United States v. Suzuki,* 14 M.J. 491 (C.M.A.1983), *aff'd in part and rev'd in part on reh'g,* 20 M.J. 248 (1985)), or for violations of R.C.M. 305(f), (h), (i), or (j)—the credit is applied against the adjudged sentence, unless the accused has a pretrial agreement that provides such credit is to be applied against the sentence cap.

In this case, it does not matter whether we apply R.C.M. 305(k) or *Rock*, the result is the same. The court members adjudged a sentence that included confinement for 3 years. If the military judge had concluded that the appellant's pretrial confinement was illegal, he would have been required to apply the additional credit against the adjudged sentence, as the pretrial agreement does not indicate otherwise. *See Rock*, 52 M.J. at 156–57. *Rock* does not explain how an appellate court should apply any credit it awards because the military judge failed to do so. We will apply the credit as if we were sitting in the role of the military judge. Therefore, the 22 days of additional credit are applied against the adjudged sentence. As the sentence approved by the convening authority pursuant to the pretrial agreement is less than the adjudged sentence minus the 22 days of additional credit, the appellant is not entitled to any relief.

### V. Conclusion

The findings and sentence are correct in law and fact and on the basis of the entire record are

AFFIRMED.

Senior Judge SCHLEGEL concurs.

BURD, Judge (concurring):

I agree completely with the lead opinion written by our Chief Judge. I write separately merely to take issue with the suggestion in Senior Judge Spisak's opinion, concurring in part and dissenting in part, that the portion of our decision in *United States v. Ozores*, 53 M.J. 670 (A.F.Ct.Crim.App.2000), which addresses *United States v. Rock*, 52 M.J. 154 (1999) should be overruled. Such action is unnecessary since the comments in *Ozores* about *Rock* are dictum. The issue in *Ozores* was sufficiency of credit awarded for an Article 13, UCMJ, 10 U.S.C. § 813, violation. We ruled it was without reference to the impact of *Rock*. *See Ozores*, 53 M.J. at 675.

SPISAK, Senior Judge (concurring in part and dissenting in part):

I concur with Parts I, II, and III of the majority opinion, but dissent from Parts IV and the result. I write separately to address a question that I believe we previously answered incorrectly, and which we now apply equally incorrectly. The question is: Should credit for illegal pretrial confinement be applied against the sentence adjudged or that approved? Our senior court apparently answered this question for us in *United States v. Rock*, 52 M.J. 154 (1999), although the answer is not as clear as one might wish. The court explained that "credit against confinement awarded by a military judge *always* applies against the sentence adjudged—unless the pretrial agreement itself dictates otherwise." *Id.* at 156 (emphasis in original). This comports with the language of R.C.M. 305(k), which provides that the remedy for failure to comply with various sections of that rule "shall be an administrative credit against the sentence adjudged . . . ."

By including the language, "unless the pretrial agreement itself dictates otherwise," the Court created an ambiguity. Is the Court saying that the agreement must specify how the credit is to be applied or did they mean that the limitation itself will determine how and where the credit is applied? I believe the latter is the proper interpretation because the Court went on to explain that where there is no pretrial agreement, or the adjudged confinement is less than that agreed to, "**any and all** credits" granted will be applied to the adjudged sentence. *Rock*, 52 M.J. at 157 (emphasis added). On the other hand, if a pretrial agreement limits confinement to a period of time less than that adjudged, "a different result obtains." *Id.*

The Court explained that a different result is required where the parties have agreed to a lesser limitation than that adjudged, because the agreed to period of confinement "becomes the maximum total confinement that the accused lawfully can be made to serve. [Therefore, w]here portions of that confinement have already been served, actually or constructively, **the credit** applies against the agreement." *Id.* (emphasis added). It appears that the court intentionally used the term "the credit" here and "any and all credits" elsewhere in the opinion. If so, the implication is that even where there is a pretrial agreement limiting confinement to

less than that adjudged, not all credits need be applied to the agreed to sentence. However, it is not immediately clear which credits qualify for such treatment and which do not.

The confusion is only exacerbated by the court's use of the term "constructively." When is confinement served "constructively?" Is the court here referring to credit granted under *United States v. Mason*, 19 M.J. 274 (C.M.A.1985), for illegal restraint tantamount to confinement? Or does "constructively" served confinement include the additional credits a military judge or this court can direct under R.C.M. 305(k) and *United States v. Suzuki*, 14 M.J. 491 (C.M.A. 1983), *aff'd in part and rev'd in part on reh'g*, 20 M.J. 248 (1985)?

I think the answer may lie in the court's assertion that military members "are not entitled to sentence credit against confinement for any and all time during the pendency of court-martial charges, even if restraints on liberty which are not tantamount to confinement are imposed. Such periods of restraint, however, can often be useful to the defense in mitigation." *Rock*, 52 M.J. at 157. *See United States v. Southwick*, 53 M.J. 412, 419 (2000) (Crawford, C.J., concurring).

One commentator suggests that *Rock* requires credit against the approved sentence for time actually served in pretrial confinement (*Allen* credit) and credit for pretrial restriction tantamount to confinement (*Mason* credit). However, he also suggests that credit for non-judicial punishment imposed for the same offense, (*Pierce* credit, *United States v. Pierce*, 27 M.J. 367 (C.M.A.1989)), credit for illegal pretrial punishment under Article 13, and additional credit granted by a military judge for illegal pretrial confinement (*Suzuki* credit), that is R.C.M. 305(k) credit, are to be credited against the adjudged sentence. Major Timothy C. MacConnell, *New Developments in Sentencing: A Year of Fine Tuning*, 2000 Army Law 78, 86 (2000). This court and our Navy brethren have also interpreted *Rock* to mandate application of R.C.M. 305(k) credit against the adjudged sentence. *United States v. Ozores*, 53 M.J. 670, 675 (A.F.Ct.Crim.App.2000); *United States v. Plowman*, 53 M.J. 511 (N.M.Ct. Crim.App.2000). Unfortunately, the *Rock*

opinion does not so clearly assert these distinctions.

However, in his concurring opinion in *Rock*, Judge Effron cited *Suzuki* and noted that "[i]f a servicemember has been subjected to illegal pretrial punishment consisting of (or tantamount to) confinement, the convening authority must apply the credit in a manner that provides effective relief." *Rock*, 52 M.J. at 157–58. He then explained that in *Rock*, if the punishment had risen to the level of confinement, the appellant would have received 8 months' credit (1.5 days for each day of pretrial punishment) against the agreed upon cap of 36 months' confinement. Thus, Judge Effron reads *Rock* to require application of credits for any illegal confinement, including R.C.M. 305(k) credit, against the "maximum lawful sentence," which in *Rock* would have been the agreed to 36 months' confinement. Clearly then, Major MacConnell is correct that *Allen* and *Mason* credit apply to the approved sentence, but it also appears that R.C.M. 305(k) and *Suzuki* credit for illegal pretrial punishment are to be applied against the approved, not the adjudged sentence.

Another commentator asserts that "the court [in *Rock*] held that whether the credit applied to the final, approved sentence, depended entirely upon the wording of the agreement [and that] [o]nly Judge Effron suggested a prospective change in the way credit would be applied." Francis A. Gilligan and Frederic I. Lederer, *Court–Martial Procedure*, § 4–102.00 (2d ed.Supp.2000). I am not as certain that the rule has not changed.

The Court in *Rock* also noted that "credit for *illegal* pretrial confinement has been incorporated" into the UCMJ by R.C.M. 305(k) and R.C.M. 1107(f)(4)(F). *Rock*, 52 M.J. at 156. (emphasis added). As already noted, R.C.M. 305(k) mandates that the military judge apply administrative credit against the sentence adjudged. On the other hand, R.C.M. 1107(f)(4)(F) mandates that when a "military judge has directed that the accused receive credit under R.C.M. 305(k), the convening authority **shall** so direct in the action." (emphasis added). These two rules seem to conflict. However, as the court noted in *Rock*, "[p]retrial confinement, or its

equivalent, cannot be bargained away in arriving at a sentence limitation." *Rock*, 52 M.J. at 157. Moreover, the military judge will not necessarily know what the sentence limitation is, or even if there is any agreed limitation, when the sentence is adjudged. Thus, it is the language of the agreement that controls. However, my review of these matters convinces me that the agreement need not say, "Any credit granted will be applied against the approved sentence." Rather, the limitation itself "dictates" how the credit will be applied.

Moreover, AFI 51–201 states:

9.8.3. Illegal Pretrial Confinement. Reflect illegal pretrial confinement in the following manner in the court-martial action, R.C.M. 1107(f)(4)(F):

In the case of (rank, name) (SSN), United States Air Force, (unit), (the sentence is approved and will be executed) (only so much of the sentence as provides for _____ is approved and will be executed). The accused will be credited with _____ days for illegal pretrial confinement.

Thus, at least in the Air Force, credit for illegal pretrial punishment is applied after the sentence is approved.

When considering all of these matters together, I conclude that USCAAF in *Rock* determined that all credit for pretrial confinement and actions tantamount to confinement, including additional credits granted by a military judge for illegal pretrial confinement, must be applied against the "maximum lawful" confinement that can be imposed in a particular case. The "maximum lawful" confinement is determined by the existence or absence of a pretrial agreement. Where an agreement caps the confinement at less than that adjudged, the cap is the "maximum lawful" sentence. Otherwise, the adjudged sentence controls. The military judge always applies credit for other forms of pretrial punishment, not tantamount to confinement, against the adjudged sentence. R.C.M. 305(k).

Here, we have found that the appellant was subjected to illegal pretrial confinement and have granted an additional 22 days credit under R.C.M. 305(k). Because the appellant's pretrial agreement provided for less confinement than that adjudged, the credit should be applied against the agreed upon sentence (the "maximum lawful sentence"), which was also the approved sentence. By applying the credit against the adjudged sentence we allow the appellant to be confined for a period longer than his "maximum lawful sentence." This result, I believe, is contrary to the court's ruling in *Rock*. I would apply the credit against the approved sentence and overrule that portion of *Ozores* that calls for a different application of credit.

Judge PECINOVSKY concurs.

BRESLIN, Judge (dissenting in part, but concurring in the result):

I respectfully dissent. The majority holds, in effect, that this commander was empowered to prevent the appellant from going out the gate, but was powerless to prevent him from going to his grave. However, the majority's decision fails to recognize the unique aspects of the system of justice created by Congress and implemented by the President to meet the special needs of the armed forces.

### Facts

The appellant sexually molested his daughter for years, beginning in 1993 when she was only 12 years old. In August 1997, after a particularly aggressive sexual assault, the child reported the abuse to a friend and, later, to her mother. Fearful of the loss of the appellant's military income, the appellant's wife decided not to report the matter to authorities—instead, they decided the appellant would live in the basement of the family home and would not be alone with the children thereafter.

The appellant sought counseling for his sexual attraction to his daughter. His counselor explained that she was required by state law to report the abuse, or that the appellant could report it himself. The appellant reported his sexual abuse of his daughter to the Alaska Department of Health and Human Services, Division of Family and Youth Services (DFYS) on 17 September 1997. The DFYS notified authorities at Elmendorf Air Force Base (AFB).

That same day, the appellant's commander ordered the appellant to have no contact with the victim during the investigation. The appellant's supervisor and his first sergeant went to his home to notify him of the order, only to find he had already moved to a motel. Concerned about his well-being, they visited him at his motel. The appellant indicated he was fine, and specifically denied any thoughts about hurting himself. The first sergeant noted that he frequently laughed nervously. They left him alone that night, convinced there was no danger he would harm himself.

The next day, the first sergeant checked on the appellant at work. The appellant became increasingly agitated, in anticipation of further developments in his case. He was again laughing nervously, then suddenly he was overcome with emotion. He told the first sergeant, "Someone had better watch me," or words to that effect. The first sergeant put him in contact with military defense counsel, then the chaplain, and then eventually took him to the base mental health clinic by ambulance.

Major (Dr.) Bradshaw, a psychiatrist serving as the Chief, Outpatient Mental Health Services, evaluated the appellant, and determined he was suicidal and required hospitalization. Apparently, the hospital at Elmendorf AFB did not offer in-patient psychiatric services, thus the medical care providers were forced to rely on local, civilian hospitals for such services. Under state law, a patient can only be involuntarily committed if he or she is actively suicidal. Dr. Bradshaw referred the appellant to a civilian hospital, Charter North, because of his suicidal ideation. The physician at Charter North found the appellant was actively suicidal, caused by anxiety over the pending criminal case. He noted a very significant family history of suicide, since the appellant's father committed suicide when the appellant was 10 years old. At first the appellant was under the highest possible security level requiring one-on-one supervision 24 hours a day. After a few days of counseling and Prozac, the appellant was downgraded to a lower level. On 30 September 1997, he was discharged from Charter North Hospital because he was no longer actively suicidal.

Immediately after his release from the civilian hospital, the appellant began outpatient treatment with Dr. Bradshaw at the Elmendorf AFB mental health clinic. Dr. Bradshaw saw him once or twice each week, depending upon his needs. The appellant often told others that the anticipation of prosecution caused him great stress. Dr. Bradshaw believed the appellant was very fragile, and that any incident related to the pending prosecution made him very anxious.

The appellant was granted leave in December 1997. Upon his return, he was again admitted to Charter North Hospital because he was planning suicide, brought about by his anxiety over the pending court-martial case. The appellant indicated he thought of many ways to kill himself in Alaska, and that he contemplated driving off into the water and freezing, among other things. During this second admission the care providers became aware of the severity of the appellant's problem with alcohol. He was diagnosed with an alcohol abuse disorder.

After the appellant's release from Charter North Hospital, he was sent for psychiatric evaluation at David Grant Medical Center, Travis AFB, California, from 4 to 9 January 1998. The appellant revealed that both his father and his grandfather had committed suicide, and that his father's suicide was precipitated by his father's sexual abuse of the appellant's sister. The appellant admitted some improvement with the antidepressant medication, but noted there were "ups and downs." He admitted that he tried to hang himself in September 1997, and that he had ideas about walking off into the Alaskan wilderness to die. However, since the appellant was not imminently suicidal, he was returned to duty.

The appellant continued in outpatient treatment with Dr. Bradshaw at Elmendorf AFB. He saw Dr. Bradshaw one or two times each week. He also entered a program for treatment of alcohol abuse at Charter North Hospital. The appellant established "safety plans" with his counselors, assuring them of steps he would take to protect himself should his anxiety threaten to overwhelm his control.

The appellant's commander preferred court-martial charges against him on 10 February 1998. The appellant waived his rights to an investigation under Article 32, UCMJ. Trial was scheduled for 16 March 1998.

Over the weekend of 21–22 February 1998, the appellant had severe suicidal thoughts, prompted by a conversation with his wife. He subsequently revealed these suicidal ideations to his alcohol treatment counselors. On Monday, 23 February 1998, the counselors had him sign an agreement to remain safe, and to take certain specific steps for support if he felt suicidal.

On Friday, 27 February 1998, his alcohol treatment program counselor noted the appellant had "high potential for impulsive acting on [his suicidal ideations]." The treatment records note: "Professional agreement as to [patient's] potential lethality, yet [patient] not committable as has agreed to safety, planning for the future, keeps regular appointments [and] treatment [program] sessions [and] has developed own safety resources." The counselor indicated the appellant was then stable, but noted, "High risk for acting on [suicidal ideations] due to overwhelming internal and external stressors."

Also on Friday, 27 February 1998, the appellant met with Dr. Bradshaw at the mental health clinic. The appellant denied having thoughts of suicide.

On Monday morning, 2 March 1998, the appellant told a coworker he was happy that he had made it through the weekend. The appellant related that he had originally planned to commit suicide that weekend, and that it was a "miracle" that he was at work that morning. The appellant told his coworker in general terms how he would have accomplished the suicide.

The coworker told the first sergeant what the appellant said. The first sergeant later recalled that the coworker said "the accused talked about taking his medication or getting in his car and not com[ing] back. [The coworker] didn't know what the accused meant by getting in his car and not coming back."

The appellant also met with Dr. Bradshaw that same day. As Dr. Bradshaw later reported:

At our 2 March 1998 meeting, the accused revealed to me that he had been suicidal over the weekend. He said he had a plan on Saturday to take an excess amount of alcohol and Prozac, which he read would be lethal if taken together. Some things had occurred and he decided not to do that on Saturday. He said that he was not suicidal on Monday.

. . .

The accused showed up for his appointment on Monday. It was at that time he revealed to me that Friday he had not been totally honest. He said he already had a plan on Friday, which was not to be here on Monday.

Dr. Bradshaw was convinced the appellant had not been honest with him on 27 February 1998 about his suicidal ideations. Dr. Bradshaw alerted the first sergeant to the appellant's current state.

The first sergeant reported this matter to the commander and the staff judge advocate's office. On the evening of 2 March 1998, the squadron commander ordered the appellant into pretrial confinement. In the letter reviewing the decision (as required by R.C.M. 305(h)(2)), the commander indicated, "Confinement is necessary because it is foreseeable that MSgt Doane will commit suicide or make a suicidal gesture, or he will flee, and thus not appear at trial."

The wing commander detailed an officer previously appointed as a pretrial confinement reviewing officer (PCRO) to conduct the hearing required by R.C.M. 305(i)(2). The PCRO conducted the hearing on 6 March 1998.

The PCRO considered documentary evidence relating to the offense, and heard testimony about whether the appellant would absent himself before trial. Dr. Bradshaw, the psychiatrist, explained to the PCRO that he felt the appellant was a high risk of suicide, but that he could not then involuntarily commit him under state law. According to Dr. Bradshaw:

There are three criteria for involuntary commitment under State law. One is the inability to care for oneself; imminent risk to others; or imminent risk to self. Under

that criteria, I did not believe he could be committed. I would need to state that he has a given plan and that he is going to go and act on it at that point. At that time he did not meet that criteria. It doesn't mean he's not suicidal, but he's not imminently at harm to himself. If the accused had a plan, then he would meet the criteria.

Dr. Bradshaw specifically stated, "In my opinion, I believe he's at a high risk for either a suicide gesture or attempt before the trial on 16 March." He also indicated that he did not believe any lesser form of restraint, other than pretrial confinement, would ensure that the appellant would not attempt suicide. The appellant refused to commit himself to the civilian hospital voluntarily.

The appellant indicated he had considered suicide over the weekend, but was able to get through it. He indicated he would not absent himself without leave. Dr. Bradshaw thought that any prior comment about "driving off" was more likely a reference to suicide than a plan to desert. The defense presented witnesses who opined the appellant would not take his own life.

The PCRO determined that pretrial confinement was required under the criteria set out by R.C.M. 305(h)(2)(B). He gave greater weight to the opinion of Dr. Bradshaw, because he was a mental health expert who had worked with the appellant over several months. The PCRO also found that lesser forms of restraint were inadequate. He commented, "Much was made by MSgt Doane's counsel that it is inappropriate to use confinement to prevent suicide. This preventative aspect is a serendipitous outcome of using confinement to assure his presence at trial, not the reason for the confinement."

Trial commenced on 16 March 1998. The appellant pled guilty to molesting his daughter on numerous occasions between 1993 and 1997. The military judge accepted his plea and sentenced him to a bad-conduct discharge, confinement for 3 years, and reduction to the grade of E-4. A pretrial agreement with the convening authority limited the maximum approved sentence to confinement for 12 months and reduction to E-4.

After announcement of the sentence, civilian defense counsel formally moved for three-for-one credit for unlawful pretrial confinement. She contended that, "Confinement for suicide is governed by state law. Under Alaska state law, Master Sergeant Doane could not be involuntarily committed." She argued that since the state commitment criteria were not met, the confinement was unlawful.

The military judge denied the defense motion for additional credit for unlawful pretrial confinement. He found the PCRO did not abuse his discretion in determining that pretrial confinement was required under the circumstances, and therefore declined to award any additional administrative credit. The military judge noted that the appellant would receive 16 days credit for pretrial confinement, including the day in trial after announcement of the sentence, but before adjournment.

### The Law

The Constitution of the United States gives to Congress the authority to regulate the armed forces. U.S. Const. art. I, § 8, cl. 14. In the UCMJ, Congress provided, "Any person subject to this chapter charged with an offense under this chapter shall be ordered into arrest or confinement, as circumstances may require...." Article 10, UCMJ, 10 U.S.C. § 810. Congress also delegated to the President the authority to prescribe pretrial, trial and post-trial procedures for courts-martial. Article 36, UCMJ, 10 U.S.C. § 836(a).

Pursuant to this delegation, the President promulgated the Manual for Courts–Martial in 1951. The *Manual* provided that, "Confinement will not be imposed pending trial unless deemed necessary to insure the presence of the accused at the trial or because of the seriousness of the offense charged." *Manual for Courts–Martial, United States,* ¶ 20c, 1951. There was no requirement for a hearing or review of the decision to confine. "Full inquiry is not required, but the known or reported facts should be sufficient to furnish reasonable grounds for believing that the offense has been committed by the person to be restrained." *Id.* at ¶ 20d. The revised edition of the Manual for Courts–

Martial published in 1969 contained virtually identical language.

In 1975, the Supreme Court ruled that the Fourth Amendment requires that a neutral magistrate must review pretrial confinement to determine whether probable cause exists to detain a person. *Gerstein v. Pugh,* 420 U.S. 103, 111, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975). In *Courtney v. Williams,* 1 M.J. 267 (C.M.A.1976), the (then) Court of Military Appeals held that *Gerstein v. Pugh* applied to the military. The Court, however, went beyond the ruling in *Gerstein v. Pugh,* and required that a neutral magistrate must review more than just whether there was probable cause to detain—"[a] magistrate must decide if a person *could* be detained and if he *should* be detained." *Courtney,* 1 M.J. at 271 (emphasis added).

In 1983, the Manual for Courts–Martial was revised completely. The new Rule for Courts–Martial (R.C.M.) 305 regulating pretrial confinement of military members included the requirements of the *Courtney* decision. R.C.M. 305 provides, in pertinent part:

(b) *Who may be confined.* Any person who is subject to trial by court-martial may be confined if the requirements of this rule are met.

. . .

(d) *When a person may be confined.* No person may be ordered into pretrial confinement except for probable cause. Probable cause to order pretrial confinement exists when there is reasonable belief that:

(1) An offense triable by court-martial has been committed;

(2) The person to be confined committed it; and

(3) Confinement is required by the circumstances.

R.C.M. 305(h)(2) also requires a commander to review any decision to place a member into pretrial confinement. The rule provides:

(B) *Requirements for confinement.* The commander shall direct the prisoner's release from pretrial confinement unless the commander believes upon probable cause, that is, upon reasonable grounds, that:

(i) An offense triable by·a court-martial has been committed;

(ii) The prisoner committed it; and

(iii) Confinement is necessary because it is foreseeable that:

(a) The prisoner will not appear at trial, pretrial hearing, or investigation, or

(b) The prisoner will engage in serious criminal misconduct; and

(iv) Less severe forms of restraint are inadequate.

Serious criminal misconduct includes intimidation of witnesses or other obstruction of justice, serious injury of others, or other offenses which pose a serious threat to the safety of the community or to the effectiveness, morale, discipline, readiness, or safety of the command, or to the national security of the United States.

The Discussion of the rule lists several factors to be considered when making a decision to continue a military member in pretrial confinement. These include:

(3) The accused's ties to the locale, including family, off-duty employment, financial resources, and length of residence;

(4) The accused's character and *mental condition;*

. . .

(7) The likelihood that the accused can and will commit further serious criminal misconduct if allowed to remain at liberty.

R.C.M. 305(h)(2)(B), Discussion (emphasis added).

The Drafter's comments on R.C.M. 305 offer the following observations on the development of the rule:

The Working Group proceeded from the premise that no person should be confined unnecessarily. Neither the prisoner nor the government benefits from unnecessary confinement. *On the other hand, in determining when confinement may be necessary, the nature of the military and its mission is an important consideration.* Moreover, some of the collateral impact associated with pretrial confinement in civilian life (loss of job, income and access to defense counsel) is normally absent in the military setting and pretrial confinement is seldom lengthy.

*MCM,* Appendix 21, A21–16 (1995 ed.) (emphasis added). The Drafter's also recognize that military service has special needs that affect decisions to order pretrial confinement.

> The need for confinement to prevent serious misconduct is particularly acute in the military. The business of military units and the interdependence of their members render the likelihood of serious criminal misconduct by a person awaiting trial of even graver concern than in civilian life. Moreover, as expressed in the last sentence of subsection (B), these concerns render a broader range o[f] misconduct of a potentially serious nature. For example, the "quitter" who disobeys orders and refuses to perform duties, while others are expected to carry our unpleasant or dangerous tasks, has immensely adverse effect on morale and discipline which, while intangible, can be more dangerous to a military unit than physical violence. Thus, although the "pain in the neck" (*United States v. Heard,* [3 M.J. 14 (C.M.A.1977) ] ) may not be confined before trial solely on that basis, the accused whose behavior is not merely an irritant to the commander, but is rather an infection in the unit may be so confined. Even constant supervision accomplishes little in such cases, and military resources do not permit, nor is it reasonable to require, the establishment of some holding facility other than a confinement facility for such persons.

*MCM,* Appendix 21, A21–18 (1995 ed.).

Several reported cases show that the threat of suicide has been a factor considered in the decision to confine. *See United States v. Handy,* 48 M.J. 590 (A.F.Ct.Crim.App. 1998) (accused placed in pretrial confinement to deter repeated suicide attempts); *United States v. Dvonch,* 44 M.J. 531 (A.F.Ct.Crim. App.1996) (pretrial confinement based upon suicide attempts, attempted flight and further misconduct); *United States v. Bledsoe,* 16 M.J. 977 (A.F.C.M.R.1983) ("One of the reasons that the petitioner was continued in pretrial confinement was because he presented a danger to himself and others"), *aff'd,* 26 M.J. 97 (C.M.A.1988); *United States v. Gaskins,* 5 M.J. 772, 775 n. 5 (A.C.M.R.1978) ("This Court believes that protection of an

accused from bodily harm can, under some circumstances, be a basis of restraint upon personal liberty. *See* Standard 2.1, Standards relating to pretrial release, American Bar Association's Project on Standards for Criminal Justice"). However, none of these decisions squarely address the issue of whether R.C.M. 305 authorizes pretrial confinement for the purpose of preventing suicide.

### Analysis

#### 1. Civil Commitment v. Military Pretrial Confinement

The civilian defense counsel's contention at trial—that the state law on civil commitment controls military pretrial confinement practice—is utterly without merit. Indeed, it would not warrant serious discussion here, except that it forms the basis of the majority opinion in this case.

It is important to distinguish between state civil commitment statutes and military pretrial confinement procedures. They are fundamentally different laws, arising from different governmental needs, with different purposes and criteria. Simply stated, state law does not control practice under the UCMJ.

As noted above, the Constitution gives to Congress the authority to regulate the armed forces. Congress has done so in many ways, including the Uniform Code of Military Justice. The Constitution and the laws of the United States made pursuant to the Constitution, are the "Supreme Law of the Land; and the Judges in every State shall be bound thereby...." U.S. Const. art. VI. Where the President acts in his own authority as the Commander in Chief, and under an express delegation of authority from Congress, his power is strongest. *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 636, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

While a state has some interest in the well being of its citizens, it has no responsibility for protecting them from self-injury. *DeShaney v. Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (A state has no affirmative duty to protect citizens from themselves or others). By contrast, a military com-

mander has the affirmative duty to protect the health and safety of service members under his control. *United States v. Middleton*, 10 M.J. 123, 128 (C.M.A.1981) (commander's responsibility for health and welfare of command); *United States v. Harris*, 5 M.J. 44, 59 (C.M.A.1978) (commander has "unique responsibilities in connection with the health, safety, welfare, morale, and efficiency of those placed under his command"); *United States v. Moore*, 45 M.J. 652, 654 (A.F.Ct.Crim.App.1997).

State commitment processes are for the purpose of protecting the public from an individual, where the individual is a threat to harm himself or others. It is a civil proceeding to determine whether a person can be held involuntarily. The restraint can be for an indefinite period, and the subject is typically held in a psychiatric hospital.

The purpose of pretrial confinement in the military is to assure an accused's presence at pretrial and trial proceedings, and to prevent future serious misconduct. R.C.M. 305(h)(2)(B). It is a criminal cause, under the Uniform Code of Military Justice. The restraint is in a confinement facility, not a psychiatric hospital.

The criteria for involuntary civil commitment are unique. There is no requirement that the person seeking involuntary commitment demonstrate probable cause to believe a crime has been committed or that the subject was responsible for the offense. Alaska requires a showing that the individual is an imminent threat to himself or herself—that is, that they have a plan to kill themselves and intend to act on that plan presently.

The military pretrial confinement procedures have entirely different criteria. The procedures only apply to service members, and only when there is probable cause to believe he or she has committed an offense triable by court-martial. R.C.M. 305(h)(2)(B)(i). Military pretrial confinement procedures only require that it be "foreseeable" that the person will not appear at trial, or will engage in serious misconduct. R.C.M. 305(h)(2)(B)(iii). There is no requirement that the service member have an "imminent plan" to absent themselves from a future proceeding, or to commit serious misconduct.

## 2. Uniqueness of Military Service

The majority finds it "incongruous" that a person may be placed in pretrial confinement under circumstances when they could not be involuntarily committed through civil proceedings. However, considering the highly distinct purposes of each process, the differences are not incongruous at all.

The requirements for pretrial confinement are different because the armed forces have distinctly different interests in protecting the lives of its members, and protecting the unit from serious misconduct. As the Analysis of R.C.M. 305 noted, "[T]he nature of the military and its mission is an important consideration." *MCM*, A21–16. "The need for confinement to prevent serious misconduct is particularly acute in the military. The business of military units and the interdependence of their members render the likelihood of serious criminal misconduct by a person awaiting trial of even graver concern than in civilian life." *MCM*, A21–18.

This difference has long been recognized in the law. "[T]he rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty, and the civil courts are not the agencies which must determine the precise balance to be struck in this adjustment. The Framers expressly entrusted that task to Congress." *Burns v. Wilson*, 346 U.S. 137, 140, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953).

> This Court has long recognized that the military is, by necessity, a specialized society separate from civilian society. We have also recognized that the military has, again by necessity, developed laws and traditions of its own during its long history. The differences between the military and civilian communities result from the fact that 'it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise.' *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 17, 76 S.Ct. 1, 100 L.Ed. 8 (1955).

*Parker v. Levy*, 417 U.S. 733, 743, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). "[T]he military constitutes a specialized community governed

by a separate discipline from that of the civilian." *Orloff v. Willoughby,* 345 U.S. 83, 94, 73 S.Ct. 534, 97 L.Ed. 842 (1953). For that reason, "[m]ilitary law ... is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment." *Burns v. Wilson,* 346 U.S. at 140, 73 S.Ct. 1045.

Military members, by virtue of their service obligation, do not enjoy the same freedoms as civilians. Military members are not free to quit their jobs at will, to go where they want when they want, or to express themselves without restraint. Similarly, they are not free to injure themselves or to commit suicide. The UCMJ makes it a criminal offense for a service member to injure himself or herself. (E.g. Malingering, Article 115, UCMJ, 10 U.S.C. § 915; *MCM,* Part IV, ¶ 40; Self-injury without intent to avoid duty, Article 134, UCMJ, 10 U.S.C. § 934; *MCM,* Part IV, ¶ 103a).

There are other obvious differences between pretrial confinement in the military and civil commitment statutes. A military member could be placed in pretrial confinement where it appears he or she intends to desert—certainly no civilian could be involuntarily committed for deciding they didn't want to go to their job the next day. A service member may be placed in pretrial confinement where it is foreseeable that they will commit future serious misconduct; involuntary civil commitment would not be available under such circumstances.

Because of the close interaction between military members, suicide of one is a harm to the entire organization. The negative impact of a suicide within a command is far more deleterious to good order and discipline than an accused who is an "infection in the unit" justifying pretrial confinement. *MCM,* A21-18.

The threat of the disruption to discipline resulting from suicides has prompted official concern at the highest level. In a 4 December 1996 letter, the Chief of Staff of the Air Force noted that suicide was the second leading cause of death among active duty Air Force members, and that over thirty percent of those who completed suicide had some type of legal problems, including criminal

investigations. Recognizing this, the Air Force established new policies to reduce suicide, including the requirement that law enforcement officials release distraught interviewees only to command representatives who can provide necessary support. The Air Force also created the Limited Privilege Suicide Prevention Program in Air Force Instruction (AFI) 44–109, *Mental Health and Military Law* (1 Mar 2000), to help identify and treat service members who present a risk of suicide because of the stress of impending disciplinary action. More recently, the Air Force made it mandatory for every service member to be trained on recognizing and preventing suicide. Since 1996, the Air Force has lowered its suicide rate from 15.2 to 5.6 per 100,000 service members. Robert Burns, *Army Chief Targets Suicides,* The Washington Post, June 13, 2000, at A37.

### 3. Criteria for Pretrial Confinement

A review of the evidence available to the PCRO and the military judge makes it readily apparent that pretrial confinement was justified and appropriate in this case under the criteria set out by R.C.M. 305(h)(2)(B).

*a. An offense triable by a court-martial had been committed and the appellant committed it.*

The appellant's daughter related the details of the appellant's sexual abuse over the years. The appellant admitted his conduct to authorities. Indecent acts with a child is a serious offense, punishable by a dishonorable discharge and up to 7 years' confinement. *MCM,* Part IV, ¶ 87. It is abundantly clear that the appellant committed an offense triable by court-martial.

*b. Confinement was necessary because it was foreseeable that the appellant would not appear at a trial, pretrial hearing, or investigation.*

This appellant demonstrated continuing inability to face the upcoming trial without lapsing into despair and contemplating suicide. After reporting his crimes in September 1997, the brief delay awaiting the arrival of investigators caused him to actively plan to commit suicide, resulting in his involun-

tary commitment. Again in October 1997, the pendency of the trial prompted him to again plan to commit suicide, resulting in a second involuntary hospitalization. In December 1997, he was again hospitalized, and the records reflect the great increase in despair he felt upon realizing that the prosecution was drawing nearer. Two weeks before the period in question, he reported suicidal thoughts to his alcohol treatment counselor, because of his stress over the upcoming case. Finally, in late February 1998, he was again brought to the brink of self-destruction over fears of his fate at trial.

The appellant's representations to the contrary were singularly unpersuasive. First, he was not credible. On 27 February 1998, he told Dr. Bradshaw he was not a risk to himself. On Monday, 2 March 1998, he related that he had been planning to commit suicide that weekend, and that it was a miracle he was at work on Monday. Secondly, even if he truly believed what he was saying, his history showed he was too mercurial to be reliable—on several occasions, his disposition changed in the space of a few short hours, based upon relatively innocuous events.

It has long been recognized that a valid purpose for pretrial confinement was to assure the accused's presence at trial. *United States v. Bayhand,* 21 C.M.R. 84, 90, 1956 WL 4553 (C.M.A.1956). It is beyond cavil that a person who commits suicide will not be present at trial. In the same way, it is foreseeable that a person who attempts to kill himself or herself would, as a result of the injuries sustained, be unavailable for trial.

The appellant attempts to couch this element of the pretrial confinement criteria in terms of "whether the accused is a risk of flight," so to narrow the criteria. The human impulse for self-preservation being what it is, it seems logical that the largest number of service members who would take action to absent themselves from trial by court-martial would choose flight rather than self-destruction. Of course, the drafters of the Manual for Courts–Martial must have known this as well. If the drafters had intended to limit the applicability of R.C.M. 305 to those who flee, and not to include those who attempt

suicide, they could have easily used language to that effect. The fact that the *Manual* uses the broader language "the prisoner will not appear at trial" indicates the drafters intended the broader construction. One of the most fundamental principles of statutory construction is that language clear and unambiguous on its face is accorded its plain meaning. *United States v. Davidson,* 14 M.J. 81, 90 (C.M.A.1982) (Cook, J., concurring in part and dissenting in part).

*c. Confinement was also necessary because it was foreseeable that the appellant would engage in serious criminal conduct.*

Because of the uniqueness of military service, self-inflicted injury is a criminal offense. A service member who intentionally injures himself or herself for the purpose of avoiding service obligations in peacetime is guilty of malingering, which is punishable by a dishonorable discharge, forfeiture of all pay and allowances, and confinement for 5 years. Article 115, UCMJ, 10 U.S.C. § 915; *MCM,* Part IV, ¶ 40. Self-injury, even without intent to avoid service, may be punishable if under the circumstances it was prejudicial to good order and discipline, or was of a nature to bring discredit on the armed forces. Article 134, UCMJ, 10 U.S.C. § 934; *MCM,* Part IV, ¶ 103a. Even in peacetime, the offense is considered sufficiently serious to warrant a maximum punishment of a dishonorable discharge, forfeiture of all pay and allowances, and confinement for 2 years. *MCM,* Part IV, ¶ 103a(e)(1). Since it was foreseeable that the appellant would injure himself, it was foreseeable that he would commit future misconduct and pretrial confinement was justified under R.C.M. 305(h)(2)(iii)(b).

*d. Less severe forms of restraint were inadequate.*

The PCRO explored the possibility of lesser forms of restraint and found them inadequate. Dr. Bradshaw, who had counseled the appellant for months leading up to the hearing, opined that there was no lesser form of restraint which would ensure that the appellant would not attempt suicide.

Any suggestion that the commander was obligated to put the appellant in a dorm room under 24–hour supervision would be unworkable. First, it is unreasonable. The Drafters of R.C.M. 305 recognized there were limitations on commander's options based upon resources. "Even constant supervision accomplishes little in such cases, and military resources do not permit, nor is it reasonable to require, the establishment of some holding facility other than a confinement facility for such persons." *MCM*, Appendix 21, A21–18 (1995 ed.). Secondly, placing the appellant in a room with 24–hour supervision would be *tantamount* to confinement. *See United States v. Powell*, 2 M.J. 6 (C.M.A.1976); R.C.M. 304(a)(2)–(4). It would be illogical to say that pretrial confinement was unlawful because conditions *tantamount* to confinement were not employed. Finally, there will often be cases such as this one where the squadron had no personnel available for a 24–hour watch.

It should also be noted that another form of restraint—in-patient hospitalization—was also considered but found to be unavailable. While one may argue whether that would be a lesser form of restraint, it is clear authorities explored that possibility.

### 4. The Majority Opinion

The majority opinion holds that the language of R.C.M. 305(h)(2)(B)(iii)(a) "not appear at trial" does not cover suicide, or attempted suicide. However, the reasons cited by the majority do not support this construction.

The majority declares that commitment for possible suicide is a "medical issue," and proposes that commanders turn over responsibility for suicidal service members to medical personnel. Of course, like drug addiction, sanity, and a host of other topics, the threat that an offender will commit suicide is *both* a medical matter and a legal issue. This Court cannot wash its hands of the responsibility for handling the legal aspects of the problem.

What the majority overlooks is that whether a person meets the criteria for involuntary commitment is not a medical decision—rather it is established by *law*. The majority would have military law defer to medical judgments, but fails to recognize that medical decisions in this area are controlled by state law. The facts in this very case illustrate this problem. The attending psychiatrist, Dr. Bradshaw, expressed his medical opinion that the very best thing for his patient would be to be hospitalized, but he couldn't order that because the appellant did not meet the *legal* criteria for involuntary commitment. The result of the majority's disposition would be that the President's requirements for pretrial confinement in R.C.M. 305 would be replaced by individual state criteria for involuntary commitment.

The majority attempts to distinguish suicide from other forms of absence from trial by observing that, if a suicide is successful, there will be no trial. This argument is unpersuasive however—if a desertion is fully successful, there will be no trial either. But, where desertion is foreseeable, pretrial confinement is permitted.

The majority also relies on *Berta v. United States*, 9 M.J. 390 (C.M.A.1980) (mem.) for the proposition that "holding pretrial confinement is not appropriate to protect an accused from injury from others." However, this memorandum opinion does not hold, as a matter of law, that a member could not be placed in pretrial confinement for his own protection, but only that it was not shown to be appropriate in that case. More recently, our superior Court recognized a legitimate military purpose in assigning a U.S. Air Force Academy cadet to a transitional squadron after release from pretrial confinement. The Court held that "appellant's placement in C[adet] S[quadron] 41 could be justified merely on the basis of military purpose under RCM 304(h), i.e. ensuring his safety.... Even appellant admitted the likelihood of being subjected to a "blanket party" (wrapped in a blanket and beat up)." *United States v. Smith*, 53 M.J. 168, 173 (2000).

The majority's ruling is not only contrary to the clear language of the President's rule (R.C.M. 305), it is also unworkable. If state involuntary commitment law controls, it would vary from state to state—hardly a uniform code. The Department of Defense Directives (DoDD) cited by the majority demonstrate the conflict between military

standards and civilian standards for involuntary commitment. As noted above, Alaska law required the patient to be an imminent threat, defined as having a present plan to commit suicide. Under DoDD 6490.1, *Mental Health Evaluations of Members of the Armed Forces,* ¶ 4.2.3.1, (1 October 1997), commanders are required to refer service members for emergency mental health evaluations when the member "intends or is likely to cause serious injury to himself, herself or others...." Also, involuntary hospitalization is appropriate when a privileged provider determines the members "poses a danger to himself, herself and/or others, such that the evaluation or treatment cannot reasonably be provided by a less restrictive level of care...." *Id.,* at ¶ 4.5.2. Thus, the DoD standards are different than those applied in Alaska. While that difference may seem slight, it was pivotal in this case, since the appellant met the DoD standard, but did not meet the criteria under the state law.

The UCMJ is supposed to be a uniform code, and is supposed to work in combat conditions as well as peacetime. Not every combat unit will have immediate access to medical personnel qualified and able to provide psychiatric counseling services—indeed, this fairly large base did not have facilities for inpatient psychiatric treatment. The majority's ruling denies a commander a necessary tool for handling an accused whose threat of self-destruction presents an immediate threat to the unit.

The majority opinion would also be difficult for practitioners to understand. The opinion indicates that an accused may not be placed in pretrial confinement solely to prevent suicide, but then agrees that an accused's mental condition is appropriate consideration when determining whether he or she will be present for trial. Does it mean suicide risk cannot be the only factor, but can be one factor in deciding to place someone in pretrial confinement? Can it be the determinative factor? If it is a factor that may be considered, why can it not be the most significant factor?

The opinion does not shed any light on what a commander should do in circumstances exactly like these. If it is foreseeable that an accused will kill himself, but civil involuntary commitment is unavailable because the accused will not admit to this present plan, does it mean the commander cannot do anything? Or may a commander impose lesser forms of restraint, but not put the member into pretrial confinement? If a commander has the authority to impose conditions on liberty or lesser forms of restraint *tantamount to confinement,* why then can he not order the member into pretrial confinement? This Court does a disservice to military commanders, and to the judge advocates who advise them, if we do not give clear guidance on these matters.

*5. Conclusion*

The criteria for pretrial confinement in the military are different than the criteria for civil commitment. The military procedures are different because they need to be to meet the special requirements of military service. The rule promulgated by the President authorizes pretrial confinement where it is foreseeable the service member will not appear at trial or may engage in serious misconduct. The threat of suicide meets both these criteria. Therefore, the PCRO did not abuse his discretion in approving continued pretrial confinement, and the commander did not order pretrial confinement improperly.

I do not suggest that commanders could or should order members into pretrial confinement lightly. Personal freedom is one of our most cherished rights. Depriving an individual of liberty is a drastic measure, to be employed only when clearly necessary. Pretrial confinement to prevent suicide should only be imposed in truly unusual circumstances—such as the present case—where the service member's history and the medical experts agree that the member is a real risk for suicide, but civil commitment is unavailable.

*Credit*

I would find the pretrial confinement was not unlawful, therefore no additional credit for the pretrial confinement is warranted. However, if it were to be applied, it should be applied against the sentence adjudged, in the manner established by the President in R.C.M. 305(k).

As discussed above, Congress delegated to the President the authority to make proce-

dural rules (Article 36, UCMJ) and the authority to set maximum punishments (Article 56, UCMJ). Pursuant to this delegation of authority, the President promulgated R.C.M. 305, setting out the procedures for pretrial confinement. R.C.M. 305(k) specifies when the accused gets credit for non-compliance with the rule. In defining this credit, the President provided that, "This credit shall be applied first against any confinement *adjudged*." I would apply this credit as specified by the President in R.C.M. 305(k).

Judge ROBERTS concurs.

STARR, Senior Judge (dissenting, but concurring in the result):

I dissent from the majority and join the opinion of Judge Breslin that the threat of suicide in this case meets the criteria established to authorize pretrial confinement. I join Senior Judge Spisak's analysis of *United States v. Rock*, 52 M.J. 154 (1999), but because I conclude that pretrial confinement was authorized, I would not grant any confinement credit in this case.

Judge HEAD concurs.